**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|                                         |   |                     |
|-----------------------------------------|---|---------------------|
| **SHARON KESSELMAN,**                   | : |                     |
|      **Plaintiff,**                     | : |                     |
|                                         | : | **CIVIL ACTION**    |
| **v.**                                  | : | **NO. 09-5446**     |
|                                         | : |                     |
| **SANOFI-AVENTIS U.S. LLC,**            | : |                     |
|      **Defendant.**                     | : |                     |
|                                         | : |                     |

---

### MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                      **March 30, 2012**

Plaintiff Sharon Kesselman brings this action against her former employer, Defendant sanofi-aventis U.S. LLC ("Sanofi" or "the Company"), pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"),[1] and the Pennsylvania Human Relations Act ("PHRA"),[2] alleging that she was constructively discharged on the basis of her age.  She also brings claims for non-payment of overtime wages pursuant to the Fair Labor Standards Act of 1938 ("FLSA"),[3] the Pennsylvania Minimum Wage Act of 1968 ("PWMA"),[4] and the Pennsylvania Wage Payment and Collection Law ("WPCL").[5]  Before the Court is Sanofi's Motion for Summary Judgment as to all claims.

---

[1]    29 U.S.C. §§ 621, *et seq.*
[2]    43 Pa. Con. Stat. §§ 951, *et seq.*
[3]    29 U.S.C. §§ 201, *et seq.* (2011).
[4]    43 Pa. Con. Stat. §§ 333.101-333.115 (2006).
[5]    43 Pa. Con. Stat. §§ 260.1, *et seq.*

## I.      FACTUAL AND PROCEDURAL BACKGROUND[6]

Kesselman was employed by prescription pharmaceutical company Sanofi and its

predecessor entity, Sanofi-Synthelabo, Inc. ("Sanofi-Synthelabo"), from June 23, 2003 until

January 21, 2008, first as a "Medical Center Specialist" and later as a "Specialty Sales

Representative."[7]  Sanofi was formed in 2004, as a result of Sanofi-Synthelabo's acquisition of

Aventis Pharmaceuticals Inc. ("Aventis").[8]  The Sanofi-Synthelabo and Aventis sales personnel

in Philadelphia were merged into a single sales team; as part of that integration, Kesselman was

transferred to a sales group supervised by District Sales Manager ("DSM") John Heslin in April

2005.[9]  Sanofi sales representatives are supervised by DSMs, who are in turn supervised by

Regional Sales Directors ("RSDs");[10] the RSD for the region including Kesselman's territory

was Tim Reilly.[11]

Sales representatives such as Kesselman are generally responsible for increasing sales in

their territories by cultivating relationships with health care providers and practices, and

supplying them with information about Sanofi products, in an effort to encourage physicians to

verbally commit to prescribing the products.[12]  Representatives are expected to use their product

knowledge, clinical studies, and other approved aids to accomplish these goals.[13]

Representatives travel to providers in their assigned territories making "sales calls" and

organizing programs or meals for physicians where either a speaker or the representative herself

---

[6]     Because we write primarily for the parties, who are familiar with the extensive and detailed record, the Court will recount only those facts necessary to explain its analysis.  The factual history is undisputed unless otherwise noted. Where there is a factual dispute, as long as Ms. Kesselman has record support for her position, the facts are viewed in the light most favorable to her.

[7]     Statement of Stipulated Material Facts ("SSMF") ¶ 2.

[8]     SSMF ¶ 3.

[9]     SSMF ¶¶ 3-4.

[10]    SSMF ¶ 8.

[11]    SSMF ¶ 33.

[12]    SSMF ¶¶ 7, 9.

[13]    SSMF ¶ 13

provides product information.[14]  Representatives are expected to make sales calls for a minimum

of eight hours a day, and perform certain administrative tasks outside normal business hours.[15]

For example, representatives are expected to maintain logs of their sales calls and submit post-

call notes through the company's QUEST system.  Representatives are expected to "create a

business plan for their territories, successfully identify and understand sales trends by analyzing

the sales data . . . and address any underlying issues."[16]  Periodically, DSMs accompany their

representatives on sales calls (a "ride-with") and review the reports prepared by these

representatives regarding their sales call activity and analysis of territory sales data.[17]  In

connection with each ride-with, DSMs issue a Field Activity Report ("FAR") or Field Contact

Report ("FCR") summarizing the day's activities, commenting on areas of success or where

improvement is needed, and noting current sales trends in the representative's territory.

 Following the integration of Sanofi-Synthelabo and Aventis, Kesselman became

responsible for selling Lovenox, a legacy Aventis product, and Plavix, a Sanofi-Synthelabo

product which she had been selling for two years.[18]  Kesselman, who was over fifty years old at

this time, had had a successful career in pharmaceutical sales for twenty years.[19]  Her first two

years with Sanofi-Synthelabo were uneventful, and her first eight or nine months as a member of

Heslin's team were, by all parties' accounts, positive; she received a favorable 2005 Mid-Year

review and a positive October 2005 FAR from Heslin commending her efforts to learn about

Lovenox and her new territory.[20]

---

[14]   SSMF ¶ 15.
[15]   SSMF ¶¶ 18-20.
[16]   SSMF ¶¶ 12, 16.
[17]   SSMF ¶ 8.
[18]   SSMF ¶ 5.
[19]   Pl.'s Opp. to Mot. Summ. J. at 2.
[20]   SSMF ¶¶ 22-28.

Kesselman's employment problems appear to have started in January or February of 2006.  On January 10, 2006, Heslin accompanied Kesselman on a scheduled lunch call to Dr. Moehler.  On arrival, they learned that Dr. Moehler was in Europe, but they remained at the hospital and spoke to other staff.[21]  Kesselman recorded this visit as a sales call on her log.[22]

Heslin again accompanied Kesselman on February 8-9, 2006.  The FAR completed by Heslin following this ride-with noted that "there has been a dramatic downturn in business over the last few months. . . . [which] may be directly due to the fact that your targeting list is not complete and accurate . . ." and requested that she update her business plan and targeting list immediately.[23]  Kesselman also recorded a sales call to Dr. Nejman on February 9;[24] however, Dr. Nejman was not in that day.[25]

Heslin discovered a number of discrepancies between Kesselman's sales-call logs and his own records of the January and February ride-with days, and met with Reilly and Kesselman on February 13 and 17 to discuss these records.[26]  As a result of this meeting, Heslin issued

---

[21]   Heslin recalled meeting with only office staff and nurses.  SSMF Ex. 7 (Letter from John Heslin to Human Resources Generalist Todd Lewandowski (undated)).  Kesselman testified that she is unable to recall whether these staff included the level of medical professional required to meet the Sanofi sales call definition.  Kesselman Dep. at 355-56.

[22]   SSMF ¶ 29; Kesselman Dep. at 366 (testifying that she had recorded the lunch as a sales call because she believed she should get credit for her time, and that she believed the majority of her colleagues would have done the same).

[23]   SSMF Ex. 6 (Feb. 8-9, 2006 FAR).

[24]   SSMF ¶ 32.

[25]   Kesselman testified that she later realized that, with regard to Dr. Nejman, she had met with a female physician whom a nurse later identified as Dr. Nejman, but that there were several female doctors in the Emergency Room at the time and it is possible that the nurse misunderstood which doctor Kesselman meant.  Kesselman Dep. at 173-74.

[26]   SSMF ¶¶ 33-36 & Ex. 7 (Heslin Letter to Lewandowski); SSMF Ex. 6 (Feb. 8-9, 2006 FAR).  In their briefing, the parties discuss only two specific instances of inaccurately recorded calls (Dr. Moehler and Dr. Nejman), but Heslin notes many other discrepancies in his letter to Lewandowski.

Kesselman a Notice of Policy Violation,[27] and circulated Sanofi's "Sales Professionals Procedures and Expectations" policy to all representatives.[28]

In July 2006, Heslin sent Kesselman a "Coaching Letter," reiterating the Company's expectations regarding call activity and recording of sales calls, and noting that she had not met these expectations during the first half of the year.[29]  In response, Kesselman repeatedly voiced her opinion that Sanofi's sales call policy was unrealistic, and lodged a complaint with Human Resources, expressing her feeling that Heslin had unfairly singled her out for censure on this issue.[30]

Subsequently, Kesselman received "Below" ratings on her 2005 Year-End Evaluation,[31] her 2006 Mid-Year Review,[32] and her 2006 Year-End Evaluation.[33]  As a result of the low ratings, she received no increase in salary for those years.[34]

Throughout 2006 and 2007, Heslin continued to note his dissatisfaction with Kesselman's grasp of clinical data, especially with regard to Lovenox,[35] her ability to analyze trends in her territory sales data, and her planning and execution of target sales calls.[36]  Kesselman has acknowledged that Heslin "was definitely more data driven" than she was, and that he required

---

[27]   SSMF Ex. 8 at 3 (May 31-June 1 FAR).
[28]   SSMF ¶¶ 35-36 & Ex. 1 (Sales Professionals Procedures & Expectations (effective Jan. 1, 2006)). Sanofi's policy defines a "sales call" as a "face-to-face interaction with a physician," excluding "office visits where the Sales professional merely waives [sic] to the doctor or sees the doctor from a distance; or merely provides samples and witnesses a sample signature; drops off literature, or arranges for or reconfirms a program, or talks with the office staff, or otherwise feels that he or she has 'moved the business'."  Furthermore, "[r]ecording as a Sales Call something that does not meet the definition . . . will be regarded as a falsification, and will result in termination."  SSMF ¶¶ 35-36.
[29]   SSMF Ex. 10.
[30]   SSMF Ex. 6; Def.'s Reply in Supp. of Mot. Summ. J., Ex. A(1).
[31]   SSMF ¶ 39 & Ex. 9.
[32]   SSMF ¶ 45 & Ex. 12.
[33]   SSMF ¶ 46 & Ex. 13.
[34]   Kesselman Aff. at ¶ 14.
[35]   SSMF ¶¶ 41-44 & Ex. 11 (August 14-15, 2006 FAR noted that "at sixteen months selling Lovenox, [Plaintiff] should be able to have conversations with the physicians and feel comfortable presenting the studies and handle most objections routinely.").
[36]   SSMF Exs. 14 & 15.

similar data analysis from his other sales associates, but that she thought his data requests were unnecessary.[37]  In February 2007, Heslin issued Plaintiff a second Coaching Letter, addressing her ongoing inability "to use clinical information in a selling situation."[38]  In response, Kesselman protested that she had "clearly demonstrated that [she] perform[ed] [her] job duties very competently," that "sales is not an exact, objective science," and that Heslin's "micromanagement and harassment" of her was "disparate and unfair."[39]

On August 20, 2007, with the review and approval of the Human Resources Department and RSD Reilly, Kesselman was placed on a Final Written Plan.[40]  The Plan detailed the perceived deficiencies in Kesselman's performance in territory management and business acumen; sales call targeting, frequency and execution; and product knowledge.  The Plan noted her supervisors' concern that there was a "big gap between the documented behavior and actions in the field and [her] perception of how [she was] doing."[41]  It set out the Company's expectations for her improvement, and a detailed plan of action to address these, which included submitting a written business analysis every month, weekly and daily call plans and post-call analyses, and weekly activity reports noting key appointments.[42]  It also required her to, *inter alia*, update her targeting list by the first of each month, develop a tracking tool to assist her in meeting her targets, and create an Account Map for each of her client institutions.[43]  The Plan was designed to remain in place for sixty days, during which Kesselman's progress would be

---

[37]    SSMF ¶ 44 (Plaintiff testified that Heslin had showed her sample analyses from at least two other representatives in her district).

[38]    SSMF Ex. 16 (stating that, despite further one-on-one Lovenox training in October and November 2006, Heslin found Plaintiff's understanding and use of clinical information during sales calls "unacceptable").

[39]    SSMF Ex. 17 (Kesselman e-mail to Reilly (Feb. 21, 2007), attaching her memorandum to Heslin regarding the February 8, 2007 coaching document).

[40]    SSMF ¶¶ 51-58 & Ex. 18.

[41]    SSMF Ex. 18 at 1.

[42]    Id. at 4-5.

[43]    Id.

reviewed on a regular basis.[44]  At the conclusion of the sixty-day period, the Plan could be lifted

or extended based on Kesselman's progress or, if she showed no improvement, Kesselman could

be terminated.[45]  The Plan also provided that Kesselman would not be eligible to apply for other

positions in the Company for twelve months, would automatically be assigned a "Below" rating

for 2007, would not be eligible to earn a bonus for six months, and would not be eligible for an

annual performance adjustment in pay or awards for performance in 2007.[46]  As an alternative to

working toward the expectations, the Plan provided an optional Performance Transition Pay

Program.[47]

 Kesselman objected vehemently to her supervisors' characterization of her

performance,[48] and to the expectations laid out in the Plan,[49] but agreed to work with it.  By

September, Heslin felt that Kesselman's performance had improved significantly in certain

aspects; he noted these improvements in his September 5, 2007 FCR,[50] which Kesselman

thought was both positive and negative.[51]  Upon reviewing the September FCR, Reilly noted to

Heslin and Mirra that Kesselman "[had] set the bar . . . she [had] demonstrated that she can do . .

. time will tell her commitment."[52]

 On October 4, 2007, approximately fifteen days before the conclusion of the Final

Written Plan, Kesselman took short term disability leave because she was suffering from severe

---

[44] SSMF ¶ 56.
[45] Mirra Decl. ¶ 11.
[46] SSMF Ex. 18 at 1.
[47] SSMF ¶ 55; Kesselman Dep. at 409-10 (testifying that she perceived the Transition Pay Program as encouragement to resign).
[48] SSMF Ex. 19 (Email dated Aug. 24, 2007, from Reilly to Plaintiff and copied to Heslin, Mirra, and Moisan, expressing his concern that Plaintiff "[did] not see the need to change or improve," and "remain[ed] unwilling to accept feedback.")
[49] SSMF Ex. 20 (Email dated Aug. 28, 2007, from Plaintiff to Reilly and copied to Heslin and Mirra, stating that Plaintiff's territory "does not have enough physicians to [plan to see] 10-15 per day.")
[50] SSMF ¶ 60 & Ex. 21.
[51] SSMF ¶ 61; Kesselman Dep. at 438 (testifying that Heslin "would throw out a few bones here and there that were positive").
[52] SSMF ¶ 62 & Ex. 21.

vertigo.[53]  Kesselman returned to work on December 3, 2007, but through a combination of

accrued vacation days and annual company shut-down time over the holidays, worked only a few

days between her return and her resignation.[54]  She met with Heslin once following her return;

during the meeting he informed her that, because there were approximately two weeks remaining

on the Final Written Plan at the time Plaintiff took disability leave, the Plan would be extended

for a number of weeks after her return.[55]  On January 8, 2008, Kesselman submitted her letter of

resignation.[56]

On or about February 12, 2008, Kesselman filed a complaint with the Pennsylvania

Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission

("EEOC"), alleging that she was subject to discrimination and harassment based upon her age,

culminating in her constructive discharge.  Kesselman initiated the action in this Court on

November 13, 2009.  On March 22, 2010, the EEOC issued a Right to Sue letter, and Kesselman

filed the Amended Complaint on April 12, 2010.  Defendant answered in a timely fashion, and

after discovery, filed the instant Motion for Summary Judgment within the time permitted by the

Court.

## II.      STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate if "the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[53]    SSMF ¶ 63; Kesselman Dep. at 9.
[54]    Kesselman Dep. at 32.
[55]    The length of the extension is disputed by the parties.  Heslin's letter to Kesselman summarizing their meeting states that the Plan will be extended 30 to 60 days (SSMF Ex. 22); Kesselman testified that she was told it could be extended "indefinitely." Kesselman Dep. at 37.
[56]    Kesselman Dep. at 48.

matter of law."[57]  A party moving for summary judgment has the initial burden of supporting its motion by reference to admissible evidence showing the absence of a genuine dispute of a material fact or showing that there is insufficient admissible evidence to support the fact.[58]  Once this burden has been met, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."[59]

Summary judgment should be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."[60]  A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[61]  A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[62]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[63]  Further, a court may not weigh the evidence or make credibility determinations.[64]  Nevertheless, the party opposing summary judgment must support each essential element of his or her

---

[57]  Fed. R. Civ. P. 56(a) (2011).
[58]  Fed. R. Civ. P. 56(c).
[59]  Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).
[60]  Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988).
[61]  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[62]  Id.
[63]  Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005).
[64]  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).

opposition with concrete evidence in the record.[65]  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[66]


## III.   DISCUSSION

### a.  Plaintiff's Overtime Claim

The Fair Labor Standards Act and the Pennsylvania Minimum Wage Act mandate that employees be paid overtime wages above their standard hourly rate for every hour over forty worked per week, unless the employee falls within a statutorily exempt category.  The parties do not appear to dispute that Kesselman often worked more than forty hours per week; however, Sanofi argues that, as a Specialty Sales Representative, Kesselman was not entitled to overtime pay pursuant to the "administrative employee" exemptions to the FLSA and the PMWA.[67] FLSA regulations define an "employee employed in a bona fide administrative capacity" as any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week ... exclusive of board, lodging or other facilities;
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.[68]

---

[65]   Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[66]   Anderson, 477 U.S. at 249-50 (citations omitted); see also Berckeley, 455 F.3d at 201 (3d Cir. 2006) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party . . . .").  This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976)).

[67]   29 U.S.C. § 213(a)(1).  Sanofi also argues that Plaintiff is exempt as an "outside salesman;" the Court finds it unnecessary to address this argument as Third Circuit precedent establishes that Plaintiff is an administrative employee.

[68]   29 C.F.R. § 541.200(a) (2010).  "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).

Similarly, the PMWA's administrative exemption "applies to employees whose (1) salaried compensation is at least $250 per week, exclusive of board, lodging or other facilities; (2) primary duty consists of the performance of office or non-manual work directly related to management policies or general operation of his employer or the customers of the employer; and (3) primary duty requir[es] the exercise of discretion and independent judgment."[69]

The Third Circuit has recently found pharmaceutical sales representatives exempt as administrative employees under the FLSA and the PMWA.[70]  In Smith v. Johnson & Johnson, the Court held a sales representative was engaged in work directly related to the management or general business operations of the employer because the "position required her to form a strategic plan designed to maximize sales in her territory," which "involved a high level of planning and foresight."[71]  Because Smith "executed nearly all of her duties without direct oversight" and considered herself "the manager of her own business who could run her own territory as she saw fit[,]" the Court concluded that Smith was subject to the administrative employee exemption under the FLSA.[72]

In Baum v. AstraZeneca, the Court, relying on Smith, held that plaintiff's work related to her employer's general operation because she marketed and advertised its pharmaceutical products.[73]  The plaintiff also had "significant discretion in how she would approach physicians, whether it be through access meals, peer-to-peer meetings, or other means," "spent the majority of her time in the field, unsupervised," "decided how much time she would spend with a given

---

[69]   Baum v. AstraZeneca, 372 F. App'x 246, 248 (3d Cir. Mar. 24, 2010) (citations and quotations to Pennsylvania Code omitted).

[70]   Smith v. Johnson & Johnson, 593 F.3d 280 (3d Cir. 2010) (FLSA); Baum, 372 F. App'x 246 (PMWA). District courts within the Third Circuit have followed suit. See Ibanez v. Abbott Laboratories, Inc., No. 09-1406, 2011 WL 5572621 (E.D. Pa. Nov. 15, 2011) (FLSA and PMWA); Jackson v. Alpharma, Inc., No. 07-3250, 2010 WL 2869530 (D.N.J. July 19, 2010) (FLSA).

[71]   Smith, 593 F.3d at 285.

[72]   Id.

[73]   Baum, 372 F. App'x at 248.

11

physician . . . . [and] whether she would use a detail aid," such that her "day-to-day activities involved making numerous independent judgments on how best to promote [her employer's] products."[74]  The Third Circuit therefore held that plaintiff was subject to the administrative employee exception to the PMWA.

Having carefully considered the undisputed and stipulated facts of this case, Kesselman's deposition testimony, and record documents reflecting Kesselman's own assessment of her job responsibilities and accomplishments, the Court finds Smith and Baum controlling.  Like the plaintiffs in Smith and Baum, Kesselman spent most of her working hours unsupervised[75] and was responsible for developing her own target list of physicians, daily and monthly sales call itineraries, and a business plan for her territory based on her extensive knowledge of clients and sales data.  Although, like Smith and Baum, she often worked from company-approved materials and was expected to convey certain product information during calls, she otherwise had discretion as to how to organize and conduct the calls.  In general, she considered herself the "boss" of her territory.[76]

These activities, which closely parallel the activities of Smith and Baum, "reflect [her] ability to develop strategies; to approach, communicate, and cultivate relationships with physicians; and to operate without constant supervision in the field."[77]  Furthermore, they "are consistent with relevant definitions of exempt administrative work because they affect Defendant's business operations to a substantial degree, . . . and involve sales and promotional

---

[74]   Id. at 249.
[75]   Kesselman Dep. at 374 (testifying that Heslin accompanied her on sales calls approximately 1-2 days a month).
[76]   SSMF Ex. 2 at 2 (Kesselman, Self-Assessment, 2005 Year-End Evaluation)
[77]   Ibanez, 2011 WL 5572621, at *3 (citing Smith, 593 F.3d at 282; Baum, 2010 WL 1063935 at *2).

work on behalf of Defendant that reflect the exercise of discretion and independent judgment with respect to matters of significance . . . ."[78]

Kesselman argues her situation is distinguishable, because Heslin's heightened oversight of her activities and the restrictions and demands placed on her as a result of the Final Written Plan issued in August 2007 robbed her of the autonomy, discretion, and independent judgment required to qualify as an administrative employee.  The Court disagrees.  The Final Written Plan required Kesselman to submit a written business analysis monthly, update her targeting list by the first of each month, submit weekly call and daily call plans and post-call analyses, and submit weekly activity reports noting key appointments.[79]  With the exception of increased reporting to and oversight by her managers, these activities and duties did not alter Kesselman's general responsibilities, and were similar to Heslin's expectations of other representatives on his team, and the activities of the plaintiffs in Smith and Baum.[80]  While it is true that Kesselman was subject to greater scrutiny in her last eighteen months at Sanofi, especially under the Final Written Plan, the increased demands and restrictions did not change the fundamental nature or essential components of her job.  Consequently, the Court holds that Kesselman was an

---

[78]   Id. (citing 69 Fed. Reg. 22,122, 22,138 (Apr. 23, 2004) (codified at 29 C.F.R. pt. 541 (2011)); 29 C.F.R. § 541.200(a) (3) (2010)).

[79]   SSMF Ex. 18 at 4.

[80]   Smith's employer "gave [her] a list of target doctors that it created and told her to complete an average of ten visits per day" but "left the itinerary and order of Smith's visits" up to her.  Smith, 593 F.3d at 282.  Smith "worked off of a prepared 'message'" provided by her employer, which also "gave her pre-approved visual aids and did not permit her to use other aids."  Id.  She was "required to plan and prioritize her responsibilities in a manner that maximized business results," "complete[] pre-visit reports" and "post-visit reports summarizing the events of the visits."  Id. at 283.  As a result, Smith often worked more than eight hours a day.  Id.  Baum "normally worked sixty to seventy hours per week. . . . call[ing] on eight or nine physicians a day . . . . On top of her field work, Baum spent approximately an hour each day checking e-mails, filling out expense reports, and working on spreadsheets."  Baum, 372 F. App'x at 247.  "After each visit, Baum would make post-call notes . . . ."  Id. at 249.

administrative employee and, as such, is not entitled to overtime pay under the FLSA or the PMWA.[81]

### b. Plaintiff's Age Discrimination Claim

The ADEA prohibits an employer from discharging or discriminating against any individual over the age of forty "because of such individual's age."[82]  The Supreme Court has stated that "the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor."[83]  Instead, to establish a claim under the ADEA, a "plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision."[84]  In other words, "[t]he burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in the decision."[85]  In so holding, the Supreme Court noted that it "has not definitively decided whether the evidentiary framework of McDonnell Douglas Corp. v. Green . . . utilized in Title VII cases is appropriate in the ADEA context."[86]  However, the Third Circuit has "conclude[d] that the but-for causation standard required by Gross does not conflict with [its] continued application of the McDonnell Douglas paradigm in age discrimination

---

[81]    Plaintiff's remaining arguments rely primarily on case law outside this Circuit, or request that this Court defer to the positions set forth in *amicus curiae* briefs filed by the Department of Labor in In re Novartis, 611 F.3d 141 (2d Cir. 2010), and Christopher v. SmithKline Beecham Corp., 635 F.3d 383 (9th Cir. 2011).  The Third Circuit disregarded those briefs in Smith and Baum, and this Court will do likewise.
[82]    29 U.S.C. § 623(a)(1).  In relevant part, the PHRA also prohibits an employer from discharging an individual because of age. 43 Pa. Con. Stat. § 955(a).
[83]    Gross v. FBL Financial Services, Inc., 129 S.Ct. 2343, 2349 (2009).
[84]    Id. at 2351.
[85]    Id. at 2352.
[86]    Id. at 2343, 2349 n.2. (2009) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

cases,"[87] where, as here, a plaintiff has adduced no direct evidence of discrimination based on her age.[88]

Under McDonnell Douglas, a plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence.  "The existence of a *prima facie* case of employment discrimination is a question of law that must be decided by the court but the *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied."[89]  If a plaintiff establishes her *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection. . . . The plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action."[90]

A plaintiff may demonstrate pretext, and so defeat a motion for summary judgment, by either "(i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a

---

[87]   Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009) ("Gross stands for the proposition that it is improper to shift the burden of persuasion to the defendant in an age discrimination case.  McDonnell Douglas, however, imposes no shift in that particular burden. . . . Throughout [the McDonnell Douglas ] burden-shifting exercise, the burden of persuasion, including the burden of proving 'but for' causation . . . remains on the employee.  Hence, Gross, which prohibits shifting the burden of persuasion to an ADEA defendant, does not forbid our adherence to precedent applying McDonnell Douglas to age discrimination claims.").

[88]   The Third Circuit has noted that "while courts agree on what is *not* direct evidence—*e.g.*, statements by non-decisionmakers, statements by decisionmakers unrelated to the contested employment decision, and other 'stray remarks'—there is no consensus on what is."  Fakete v. Aetna, Inc., 308 F.3d 335, 338 n.2 (3d Cir. 2002). In this context, "the adjective 'direct' is imprecise because 'certain circumstantial evidence'"—such as statements of a decisionmaker that reflect a discriminatory or retaliatory animus— "is sufficient [to shift the burden of proof regarding causation], if that evidence can fairly be said to directly reflect the alleged unlawful basis for the adverse employment decision."  Id. at 339.  In the case at hand, the Court can find no direct evidence of discrimination based on Plaintiff's age.

[89]   Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007) (citing Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797-98 (3d Cir. 2003) (*per curiam*)).

[90]   Sarullo, 352 F.3d at 797.

motivating or determinative cause of the adverse employment action."[91]  The Third Circuit has
cautioned that "[i]ssues such as intent and credibility are rarely suitable for summary judgment. .
. . [because] discriminatory intent means actual motive, and is a finding of fact to be determined
by the factfinder."[92]  "To discredit the employer's proffered reason, however, the plaintiff cannot
simply show that the employer's decision was wrong or mistaken, since the factual dispute at
issue is whether discriminatory animus motivated the employer, not whether the employer is
wise, shrewd, prudent, or competent."[93]  "Rather, the non-moving plaintiff must demonstrate
such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the
employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally
find them unworthy of credence, . . . and hence infer that the employer did not act for the
asserted non-discriminatory reasons."[94]

A plaintiff may establish a *prima facie* case of age discrimination under the ADEA by
demonstrating that: (1) she is over forty, (2) she is qualified for the position in question, (3) she
suffered from an adverse employment action, and (4) her replacement was sufficiently younger
to permit a reasonable inference of age discrimination,[95] or her "employer retained a sufficiently
younger similarly situated employee."[96]

Kesselman was over fifty years old when she resigned her position at Sanofi.[97]  There is
no dispute that sales representatives who remained in Kesselman's group after her resignation

---

[91]  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).
[92]  Wishkin, 476 F.3d at 184 (internal citations omitted).
[93]  Fuentes, 32 F.3d at 765 (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531, 533 (3d Cir.1992)).
[94]  Id. (internal quotations and punctuation omitted).
[95]  See Hill v. Borough of Kutztown, 455 F.3d 225, 247 (3d Cir. 2006) (citing Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004)).
[96]  Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 300-301 (3d Cir. 2004).
[97]  Kesselman Dep. at 212.

were sufficiently younger than Kesselman to permit a reasonable inference of age discrimination, if the other elements of a *prima facie* claim are satisfied.[98]

Defendant argues that Kesselman did not suffer an adverse employment action because she resigned voluntarily.  Kesselman contends that the events leading up to her resignation—including poor performance reviews and accusations of misconduct,[99] denial of bonuses or raises she believed she had earned based on her sales numbers, coaching letters and criticism of her work, denial of her request to apply to another position within the company, and the implementation of the Final Written Plan and its subsequent extension after her return to work—created such a negative work environment that she was effectively forced to resign for the sake of her health, resulting in her constructive discharge.[100]

To establish a claim of constructive discharge, and thereby satisfy the "adverse employment action" prong of the *prima facie* claim,[101] plaintiff must proffer evidence from which "'a reasonable jury could find that the employer permitted conditions so unpleasant or

---

[98]  "In order for a plaintiff to satisfy the 'sufficiently younger' standard, [the Third Circuit has] noted that there is no 'particular age difference that must be shown,' but while '[d]ifferent courts have held . . . that a five year difference can be sufficient, . . . a one year difference cannot.'"  Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 236 (3d Cir. 1999) (quoting Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995) (alteration and omission in original).

[99]  In addition to the issues related to Plaintiff's improperly recording of sales call, Plaintiff has stated that Heslin unfairly accused her of submitting an expense report during working hours.  Kesselman Dep. at 87-88.  The Court accepts that Plaintiff was distressed by the accusation, which was resolved without repercussion (Heslin Dep. at 46-47), but does not find that the event sheds light on the issues before the Court.

[100]  The Court dismisses Defendant's argument that Kesselman's "admission" that she was partially motivated to resign for health concerns "completely undercuts her claim of constructive discharge," as an independent reason for her resignation.  Kesselman has testified that she believes her medical problems were caused in large part by job-related stress.  Kesselman Dep. at 20.  Although the Third Circuit has held that health problems supporting an inference only that a work environment is "stressful" are insufficient to prove that working conditions were "intolerable," the Court did not hold (as it did regarding a plaintiff's separate financial reasons for resigning) that the existence of job-related health issues "undermine[d]" plaintiff's constructive discharge claim.  Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 170, 171 (3d Cir. 2001).

[101]  Duffy, 265 F.3d at 167.

difficult that a reasonable person would have felt compelled to resign.'"[102]  This is an objective

test, under which, even where a plaintiff "may have subjectively believed that the[]

circumstances were too onerous to bear," constructive discharge is established only where a

"reasonable trier of fact could conclude that [the acts alleged] renders working conditions

objectively intolerable."[103] Stressful, frustrating, and uncomfortable working conditions are

insufficient; rather, a plaintiff must demonstrate a pattern of conduct that rises to the threshold of

intolerability.[104]

> The Court recognizes that Kesselman's working situation was not a happy one, and

accepts that she subjectively perceived it to be intolerable, but cannot hold that a reasonable

person would have found the conditions too intolerable to continue working.  However, even

assuming that Kesselman could establish constructive discharge here, to sustain a claim under

the ADEA she must also produce some evidence from which a reasonable factfinder could

conclude that her age was the determinative factor motivating Defendant's actions.  This,

Kesselman has failed to do.

> Kesselman acknowledges that she can point to no direct evidence of discrimination based

on age—no Sanofi employee made a negative comment either directly or impliedly related to

---

[102]  Id. at 167 (quoting Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998)) (internal punctuation omitted).
[103]  Id. at 169.  In Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1161 (3d Cir. 1993), the Third Circuit identified several situations often cited as "indicative of constructive discharge: (1) a threat of discharge; (2) suggestions or encouragement of resignation; (3) a demotion or reduction of pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; (6) unsatisfactory job evaluations." Suders v. Easton, 325 F.3d 432, 445 (3d Cir. 2003) (overruled on other grounds).  However, the Court has cautioned that the absence of these "commonly cited" factors is "not necessarily dispositive," Duffy, 265 F.3d at 168, and noted in Clowes that the cases therein were "cited solely to illustrate some of the factors on which plaintiffs claiming constructive discharge have relied. . . . [but] express[ing] no view as to whether these decisions gave those factors the proper weight." Clowes, 991 F.2d at 1161, n.1.  Accordingly, the presence of Clowes factors is not dispositive either.
[104]  Duffy, 265 F.3d at 169.

Kesselman's age, or suggested that she was unable to perform her job because of her age.[105]
Kesselman has stipulated that Heslin was initially complimentary of her work, and his criticism
did not begin until at least eight months after she was transferred to his team.[106]  In fact,
Kesselman does not allege any discriminatory act before February 2007, when Heslin noted a
"dramatic down turn" in her sales, and after he discovered the discrepancies in her sales call
records.

    As evidence of age-based discrimination, Kesselman relies primarily on the fact that she
continued to receive poor performance evaluations and was placed on the Final Written Plan
even when her sales numbers were better than younger employees in Heslin's group and
sometimes, better than regional or national averages.[107]  There is a significant dispute between
the parties as to the overall characterization of Kesselman's sales numbers;[108] both parties appear
to acknowledge, however, that at times her numbers were better than average.  For the purposes
of summary judgment, the Court will accept Plaintiff's characterization of her sales as sometimes
significantly better than "middle of the pack," and better than those of several younger
representatives in Heslin's group.

---

[105]   SSMF ¶ 71.  Kesselman testified that, in 2006, she had complained to Mr. Lewandowski that
she believed Heslin was treating her unfairly, but could only speculate as to Heslin's motivation.
Kesselman Dep. at 181-82. In 2007, she expressed to Mr. Mirra her concern that she was being
singled out, and suggested Heslin was biased toward her, but could not identify the source of that
bias.  Mirra Decl. ¶ 4-5 (attesting that Kesselman explored several reasons for Heslin's alleged bias,
including her age, gender, and hair color, but admitted she had no basis for concluding he was biased for
those reasons).
[106]   SSMF ¶¶ 23-28.  Kesselman also stipulated that the last FAR she received before going on
disability leave was "fair" and included a number of positive comments by Heslin as to her
improved performance. SSMF ¶¶ 60-61.
[107]   Plf.'s Opp. to Mot. Summ. J. at 9-10, Table 1 & Exs. I-K (comparing Plaintiff's volume growth for
certain products during certain months to growth in district as a whole); Kesselman Dep. at 223
(testifying that in October 2005, Plaintiff was "roughly in the top third" of sales).
[108]   Def.'s Reply in Supp. Mot. Summ. J. at 7; SSMF Ex. 6 (Feb. 8-9, 2006 FAR, noting that "[o]verall
growth [was] down 17.9%" in Plaintiff's territory); SSMF Ex. 9 (noting that by June 2006, Plaintiff was
ranked 604 out of 852 in the nation and 58 of 80 in the region).

However, without any evidence that those representatives also logged inaccurate sales calls, failed to master product information, were unable to analyze sales data and formulate a successful business plan, Kesselman cannot establish that she was treated less favorably than any "similarly situated" younger employee.[109]  That employees younger than Kesselman do not appear to have been criticized or disciplined to the same extent is insufficient to demonstrate discrimination based on age without *some* evidence suggesting that these younger employees exhibited the same performance issues.[110]

For example, Kesselman argues that she was singled out for discipline regarding the accuracy of her sales call records, but is unable to show that any other employee had the same inaccuracies.[111]  Kesselman also asserts, as evidence of Heslin's discrimination, that she was deprived of a sales partner for long periods of time, while younger representatives consistently had partners.  The Court accepts that loss of her sales partner significantly increased

---

[109]   In 2007, "Delivers Sales Results" constituted 60% of a Sanofi sales associate's Objectives and Accountabilities; other criteria were "Selling Skills/Product Knowledge" (10%), "Territory Management" (20%), and "Teamwork" (10%).  2d Am. Compl., Ex. K.  It is therefore possible for an employee with higher sales numbers but poor performance in other areas to be evaluated less favorably than an employee with lower sales numbers who performed well in other areas.

[110]   The Court notes that it appears several younger employees in Heslin's group were, in fact, slated to begin the same "performance process." Reilly's comments to Heslin's 2007 Year-End Review include the following statement: "You did an exemplary job handling [ Kesselman]'s performance process.  It will be important to closely monitor [three other employees] through the performance process.  I am not convinced the majority of the team can be successful in their roles."  Plf.'s Opp. to Mot. Summ. J., Ex. U.  These employees, all between the ages of 31 and 33, are identified by Plaintiff as examples of younger employees with lower 2007 sales results than her own.  Plf.'s Opp. to Mot. Summ. J. at 10, Table 1.  The record does not reflect whether these employees were placed on a Final Written Plan or subject to other remedial measures, or even whether their employment was terminated, although Plaintiff testified that one of these employees is no longer with the company.  Kesselman Dep. at 235.

[111]   In support of her contention that other sales representatives recorded sales calls that did not meet the definition, she offers only inadmissible hearsay.  Kesselman Dep. at 231-32 (testifying that her training partner told her that her territory was so "restrictive" that a visit where she left a study but did not see a doctor was considered a sales call); 234-35 (testifying that another employee implied in a conversation that [the other employee] may not have written down her calls accurately, and that she does not believe that employee is still employed at Sanofi).  Furthermore, after meeting with Kesselman, and at her request, Heslin circulated Sanofi's "Sales Professionals Procedures and Expectations" policy to all representatives. SSMF ¶ 36.

Kesselman's workload, but is unable to find any evidence in the record suggesting that she was deliberately deprived of a partner.[112]  To the extent that Kesselman asserts she should have been held to a different standard in light of her lack of partner, she has been unable to tie this to her age in any way.  While Kesselman's assertion that Sanofi should have evaluated her performance differently may be logically sound, it is not the Court's role to comment on the propriety of a company's review process, where a plaintiff has not offered any evidence that the employer's actions were motivated by discrimination.  Indeed, this is the fundamental flaw running throughout Kesselman's case.  It is not enough for her to show that Sanofi was wrong, mistaken, or even unreasonable in its treatment of her, "since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."[113]  Considering all the record evidence in the light most favorable to Kesselman, even if she were able to establish constructive discharge, a reasonable factfinder could not conclude that age-based discrimination was the but-for cause of Sanofi's actions.


IV.     CONCLUSION

        For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment.  An appropriate Order follows.

---

[112]   Kesselman had several different partners during this time period, each of whom left voluntarily for other positions; when Kesselman herself was on leave, her current partner worked alone.  Heslin Dep. at 64-66.  When asked at deposition whether she "believed [Heslin] deliberately denied [her] a partner because of [her] age," she responded, "I can't say." Kesselman Dep. at 117.  Similarly, Kesselman contends that she was held to the same standard of product knowledge even though she had received less or different training than her younger counterparts (Kesselman Dep. at 179, 286) but fails to note that many of her colleagues were new hires, not legacy Sanofi-Synthelabo employees like Plaintiff.  Heslin Dep. at 219 (testifying that Plaintiff received the same training as other transition employees).  Moreover, Kesselman's first sales partner, Laura DePlacido, was a district trainer at the time and served as Kesselman's trainer. SSMF ¶ 21.
[113]   Fuentes, 32 F.3d at 765.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| SHARON KESSELMAN, | : | |
| Plaintiff, | : | |
| | : | **CIVIL ACTION** |
| v. | : | **NO. 09-5446** |
| | : | |
| SANOFI-AVENTIS U.S. LLC, | : | |
| Defendant. | : | |
| | : | |

---

**ORDER**

AND NOW, this 30th day of March 2012, upon consideration of Defendant's Motion for Summary Judgment [Doc. No. 22], and all related briefing in opposition to and in support of that motion, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby **ORDERED** that Defendant's Motion is **GRANTED**.

It is so **ORDERED**.

BY THE COURT:

/s/ Cynthia M. Rufe
_____
**CYNTHIA M. RUFE, J.**

22